## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

R.H.A.,                                            Case No. 22-cv-639 (ECW)

       Plaintiff,

v.                                                        **ORDER**

Kilolo Kijakazi, Acting Commissioner of
Social Security,

       Defendant.

This matter is before the Court on Plaintiff R.H.A.'s ("Plaintiff") Motion for

Summary Judgment (Dkt. 11) and Defendant Acting Commissioner of Social Security

Kilolo Kijakazi's ("Defendant" or "the Commissioner") Motion for Summary Judgment

(Dkt. 13).  Plaintiff filed this case seeking judicial review of a final decision by the

Commissioner denying her application for disability insurance benefits.  (*See generally*

Dkt. 1.)  For the reasons stated below, Plaintiff's Motion is denied and Defendant's

Motion is granted.

## I.       BACKGROUND

Early in 2019, Plaintiff filed an application for Disability Insurance Benefits,

alleging disability as of June 30, 2017.  (R. 265-268 (stating Plaintiff's application was

completed on April 1, 2019); *see also* R. 25 (ALJ stating application filed February 28,

2019).)[1]  Her application was denied initially and on reconsideration.  (R. 185, 192, 193,

---

[1]       The Social Security Administrative Record ("R.") is available at Dkt. 9.

200.)  Plaintiff requested a hearing, and on August 12, 2020, appeared for a telephonic hearing before Administrative Law Judge Lyle Olson ("ALJ").  (R. 25, 212-213.) Because Plaintiff wished to submit additional medical records, the ALJ gave her time to do so and then held a supplemental hearing on November 17, 2020.  (R. 25, 136-149.) Plaintiff was advised of her right to counsel at both hearings but chose to proceed without counsel.  (R. 115, 152.)  The ALJ issued an unfavorable decision on January 7, 2021, finding Plaintiff was not disabled.  (R. 25-33.)

The ALJ found that Plaintiff last met the insured status requirement of the Social Security Act on June 30, 2017.  (R. 28.)  Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a),[2] the ALJ first determined at step one that Plaintiff had not engaged in substantial gainful activity since June 30, 2017, the alleged onset date and the date last insured.  (R. 28.)

---

[2]      The Eighth Circuit described this five-step process that the Commissioner of Social Security must use as follows:

> (1) whether the claimant is currently engaged in a substantial gainful activity; (2) whether the claimant's impairments are so severe that they significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has impairments that meet or equal a presumptively disabling impairment specified in the regulations; (4) whether the claimant's RFC is sufficient for her to perform her past work; and finally, if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that (5) there are other jobs in the national economy that the claimant can perform given the claimant's RFC, age, education and work experience.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

At step two, the ALJ determined that Plaintiff had the following severe impairments: right radius neck closed fracture and shoulder separation; essential tremors; arthralgias; arthritis; mild osteoarthritic change of the left acromioclavicular joint; and tendinosis of mild to moderate severity involving the supraspinatus tendon and of mild severity of the subcapsularis tendon, left shoulder.  (R. 28.)

At the third step, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 29.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"):

> [T]o perform light work as defined in 20 CFR 404.1567(b). The claimant could lift and/or carry 20 pounds occasionally and 10 pounds frequently. She could engage in push/pull actions with the bilateral upper extremities (operation of bilateral hand controls) 20 pounds resistance occasionally and 10 pounds resistance frequently. She could sit (with normal breaks) for a total of about 6 hours in an 8-hour workday and stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday. She could frequently handle, finger and feel with the bilateral hands. She could occasionally reach overhead with the left upper extremity. She could occasionally climb ramps/stairs, balance, stoop, kneel and crouch. She could never climb ladders/scaffolds, crawl, work at unprotected heights or work with dangerous moving mechanical parts. The claimant was also able to tolerate only up to occasional exposure to extreme cold on and prior to her date last insured of June 30, 2017.

(R. 29.)

The ALJ found Plaintiff would have been able to perform her past relevant work as a Project Director, DOT# 189.117-030, skilled, SVP 8, sedentary, light as performed, on and prior to her date last insured, both as typically done in the national economy and

as Plaintiff described the job. (R. 32.) The ALJ also found, based on Plaintiff's testimony, that the job did not end due to any documented physical or mental problems but rather because Plaintiff took early retirement in about 2012. (R. 32.) The ALJ noted that a Vocational Expert ("VE"), James Miller, testified that a person with Plaintiff's age, education, work experience, and RFC would be able to perform Plaintiff's past work as a Project Director as the work was both actually and generally performed in the national economy. (R. 33.) Accordingly, the ALJ found that Plaintiff was not under a disability, as defined in the Social Security Act, at any time from June 30, 2017, the alleged onset date, through June 30, 2017, the date last insured. (R. 32-33.) The ALJ did not reach the fifth step of the sequential analysis.

Plaintiff requested review of the decision, and the Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner. (R. 6-15.) Plaintiff then commenced this action for judicial review. (Dkt. 1.)

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions. In this case, because Plaintiff's challenge is limited to issues relating to her hand tremors, the Court recounts only the record and testimony relevant to that impairment.

## II.    RELEVANT MEDICAL RECORD AND TESTIMONY BEFORE THE ALJ

On November 16, 2006, Plaintiff underwent a neurology consultation regarding her hand tremors at Montevideo Outreach with Merlin V. Nelson, M.D.  (R. 415-417.) Plaintiff reported having a tremor since she was 19 years old and she had noticed that it seemed to get worse.  (R. 415.)  She was taking primidone[3] 50 mg, two tablets at bedtime, which helped some, but she still had a tremor.  (R. 415.)  Plaintiff believed her tremor was hereditary based on family history.  (R. 415.)  She had no head or voice tremor.  (R. 415.)  On examination, Plaintiff exhibited tremor with intention only, not with rest.  (R. 416.)  Dr. Nelson had an impression of essential tremor, advised Plaintiff to increase her primidone dose to up to six tablets a day, gave her a new prescription for the primidone, and suggested that she try calcium with Vitamin D.  (R. 417.)  He also told Plaintiff that deep brain stimulation may be an option "if things worsen and she feels more functionally incapacitating."  (R. 417.)

Based on medical records from Montevideo Medical Clinic, as of October 1, 2008, Plaintiff's tremor "seem[ed] to be well controlled with primidone" and the plan was to "try to wean down a bit on dosage."  (R. 418.)

On January 17, 2013, during an office visit at Grand Itasca Clinic and Hospital, Terri J. Radovich, M.D., noted that Plaintiff, who had recently moved to the area, had

---

[3]    Primidone (brand name Mysoline) is "used alone or concomitantly with other anticonvulsants, is indicated in the control of grand mal, psychomotor, and focal epileptic seizures.  It may control grand mal seizures refractory to other anticonvulsant therapy." *See Mysoline*, https://www.accessdata.fda.gov/drugsatfda_docs/label/ 2010/009170s035lbl.pdf (last visited February 13, 2023).

5

"[r]estarted her medications for essential tremor and improved" and that essential tremor was "common in her family." (R. 1969.) At that time, Plaintiff was prescribed primidone, one 250-mg tablet twice daily, and propranolol[4], one 40-mg tablet twice daily. (R. 1969.) On the same day, Dr. Radovich's neurological examination of Plaintiff revealed "no tremor." (R. 1971.)

On June 5, 2014, Plaintiff visited the Grand Itasca Clinic and Hospital due to an upper respiratory infection. (R. 1979.) The "Past Medical History" section of the medical records from that visit notes a December 27, 2012 diagnosis of essential tremor with a "[s]trong family history," and that Plaintiff "has seen several neurologists." (R. 1978.)

When Plaintiff visited the Grand Itasca Clinic and Hospital on October 14, 2014, her neurological examination results stated "no tremor," but, as the ALJ noted, the general appearance examination stated "[m]ild tremor noted." (R. 1982; see R. 31.)

On November 13, 2017, during a new evaluation at Alomere Health Rehabilitation Services in Alexandria, Plaintiff reported knee and hip pain. (R. 2472.) She was observed to be in "good physical condition" but "d[id] have a tremor of bilateral hands, occasionally seen with slow movement of lower and upper extremities." (R. 2473.) She presented with functional limitations with respect to mobility with respect to walking/

---

[4]     Propranolol is a beta-blocker used for a variety of different uses, including, but not limited to, the treatment of blood pressure, abnormal heart rhythms, angina, and heart failure. THE PILL BOOK, 167-68 (15th ed. 2012).

6

moving around and the plan was to follow up with Plaintiff with advice and an exercise

program related to mobility, strength, and stabilization.  (R. 2474.)

Turning to Plaintiff's testimony, at the August 12, 2020 hearing, the ALJ asked

Plaintiff, "Did you have any problems writing, on or before June 30th of 2017," and

Plaintiff testified:

> Absolutely. I was diagnosed at the age of, it was about 1978, maybe '77 with essential tremors. And so, they actually had put me on medication. The medication made me tired all the time, so I quit taking it. Throughout my life I've had essential tremors to the point of my medical doctor, back in, I would say early 2000, had suggested I go on disability because of my essential tremors. And with my job, I had so much handwriting that I would have to do by instruction, bulletin boards, or chalk boards, and a lot of writing because I managed people.
>
> And so it was extremely difficult. It has been. And then, once I went on the medication for multiple myeloma, it just enhanced the tremors, to the point where my doctor had me go to a [sic] occupational therapist, trying to find out ways in which I can improve my writing.[5] But my handwriting back when I was, I would say the last five to ten years, working at Minnesota State colleges and universities, those years were impacted by my essential tremors, a lot.

(R. 120-121.)

Plaintiff further testified as follows regarding her tremors:

Q The tremors that you had on or before that date, did they affect both hands?

A Yes, yes. And --

Q Was one hand worse than the other?

---

5       The Court does not consider Plaintiff's issues with handwriting caused by her multiple myeloma medication as she was not diagnosed with multiple myeloma until 2018, after the June 30, 2017 date last insured.  (R. 141-142.)

A No. They're just both bad. And at some point it would impact my head. My head would shake, or my legs would shake. I'm a vocalist, and many times I'd have to stand up and sing when my knees would knock.

Q So what medication did you take for your tremors on or before June of 2017?

A Propranolol, and another one that starts – let's see.

Q Is it tramadol?[6]

A Tramadol, yes. I'm only on one of them now, but prior to that I was on the back of both of them.

Q So those medications did not help, you said?

A It helped for a while but, you know, when you're on it 20 years, they'll actually take a drug vacation, and -- for a couple of weeks. And then when I go back on it, it helps some, but it still is an issue. I mean, I -- no one can read my writing.

Q Well, on or before June 30th of 2017, were your tremors basically experienced all the time, constant?

A It was always -- yeah. I would say yes to that.

Q Did the tremors get worse with certain activity?

A Yes.

Q What sort of activities would make your tremors worse?

A Well let's see, if I'm in a rush, and I don't have the time I need to really kind of -- or I couldn't concentrate on the writing, it -- I guess that was primarily, you know, it was very difficult for me to handle any of those exercises at work.

Q All right. On or before June of -- 30th, 2017 were you able to tie shoes?

A Yes.

---

6       Tramadol is a narcotic used for the treatment of pain and cough .  THE PILL BOOK, 823-25 (15th ed. 2012).

Q Brush your teeth?

A Yes.

Q Brush your hair?

A Yes.

Q Use utensils?

A No, not well. You know, I could use them, but --

Q What problems did you have?

A Pardon me, what problems? Keeping --

Q Well --

A Trying to get the food on the utensil, and keeping it there until it gets to my mouth.

Q All right. Did you use special utensils then?

A I did not try that. I guess what I did more than anything was just stay away from eating in public.

Q Were you able to do buttons and zippers?

A Yes, but sometimes it's more of a struggle than others.

(R. 127-129.)

### III.   <u>LEGAL STANDARD</u>

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law. *Nash v. Comm'r, Soc. Sec. Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g) and *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)). "'Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to

support the Commissioner's conclusions.'" *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)).  The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.*  "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* (citation omitted).  In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ.  *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004).  Assessing and resolving credibility is a matter properly within the purview of the ALJ.  *See Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (citing *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003) ("Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide.").

## IV.   DISCUSSION

Plaintiff makes three challenges to the ALJ's determination.  First, Plaintiff contends that the ALJ committed reversible error in evaluating the severity of Plaintiff's hand tremors.  (Dkt. 12 at 2-5.)  Second, Plaintiff argues that the ALJ's RFC finding is not based on substantial evidence because "[m]issing from any of the ALJ's RFC or hypotheticals to the VE was any mention of [Plaintiff's] hand tremors and how they affected her." (*Id.* at 2, 5-7.)  Third, Plaintiff asserts that the ALJ committed reversible error by holding the hearing when it was "clear from the record that [Plaintiff] did not understand the 'date last insured issue' and should have been encouraged to obtain legal counsel for her complex case." (*Id.* at 2-3, 7-9.)  According to Plaintiff, these errors

10

meant the hypothetical posed to the VE did not "'comprehensively describe' [Plaintiff's] ability to engage in work-like functions, namely feeling, fingering, and handling," "the VE's responses to the ALJ's hypothetical questions do not constitute substantial evidence on which to base a denial of [Plaintiff's] claim for benefits," and consequently, remand to the Commissioner for further proceedings is appropriate. (*Id.* at 12-13.) The Court discusses Plaintiff's arguments below.

**A.      The Severity of Plaintiff's Hand Tremors**

With respect to Plaintiff's hand tremors, the ALJ identified "essential tremors" as a severe impairment (R. 28) and noted that Plaintiff "reported essential tremors on and prior to the date last insured" of June 30, 2017, but "was not taking medications partly due to changing doctors and moving" (R. 30). The ALJ further described Plaintiff's hand tremors and treatment as follows:

> The claimant also has a history of hand tremors, which go back to at least November of 2006 (Ex. 1F/5). Her tremors appeared to be mostly controlled around that time (Ex. 1F/8). She was later diagnosed with essential tremors in 2012 (Ex. 15F/19). The claimant had no tremors noted in 2013 upon a neurological examination (Ex. 15F/12). She did have a mild tremor noted in October of 2014 (Ex. 15F/23). The cla[i]mant was also noted to have tremors upon an examination in November of 2017 (Ex. 19F/369). Here, again, there is no indications of any work-related limitations due to this condition on and prior to the date last insured. She was able to use her hands when working, without any alleged or documented limitation. She was able to dress herself, take care of her personal needs, and cook on and prior to the date last insured, without any particular problem with respect to manipulation.

(R. 31-32.)

As to the RFC, the ALJ said the objective medical evidence supported no limitation further than "light exertion with limits in handling and reaching." (R. 32.) The

RFC limited Plaintiff to "frequently handle, finger and feel with the bilateral hands." (R. 29.)

Plaintiff specifically challenges the ALJ's statement that there were "no indications [sic] of any work-related limitations" due to her tremors on and before June 30, 2017 and that Plaintiff "was able to use her hands when working, without any alleged or documented limitation," because Plaintiff testified that handwriting at work was "extremely difficult," "[t]he ALJ seemed to forget that [Plaintiff] retired in 2011," and Plaintiff testified that she had difficulty getting food on utensils and keeping it there. (Dkt. 12 at 3-4 (citing R. 31-32, 121-122, 128).)

Defendant responds that the record indicates that Plaintiff's tremor "appeared mostly controlled as of 2006 to 2008, and that while she was diagnosed with essential tremor in 2012, a diagnosis alone is not disabling. (Dkt. 14 at 6 (citing *Collins ex rel. Williams v. Barnhart*, 335 F.3d 726, 730-31 (8th Cir. 2003).) Defendant notes that at Plaintiff's January 17, 2013 office visit, Dr. Radovich observed "no tremor" with respect to her neurological examination of Plaintiff, and that Plaintiff reported at the same visit that she had restarted her medications for essential tremor, which had improved. (*Id.* (citing R. 1969, 1971).) Defendant further argues that Plaintiff's testimony regarding her difficulty with handwriting at work is undermined by the fact that she worked until 2012, when she took an early retirement package at age 55; that Plaintiff had considered going back to work after her retirement; and that notwithstanding her testimony, she was able to care for herself, dress herself, perform household chores, and travel before June 2017. (*Id.* at 8 (citing R. 31, 32, 128-129, 167-168, 173-174, 369).)

The Court understands Plaintiff to be arguing that the ALJ ignored her testimony regarding her difficulties with handwriting, eating, and performing other tasks.  To the extent Plaintiff is arguing that the ALJ's statement that "[s]he was able to use her hands when working, without any alleged or documented limitation" (R. 32), is contradicted by her testimony that her handwriting was "impacted by her essential tremors, a lot" and "it was extremely difficult," there is no evidence in the record that difficulty with handwriting prompted her retirement.  On the contrary, Plaintiff's husband told the Social Security Administration ("SSA") that Plaintiff took an early retirement incentive and moved to northern Minnesota in 2012, but "[a]t that time she hadn't ruled out going back into the workforce in some position other than with the State."[7]  (R. 369.)

In sum, the Court concludes that the ALJ did not "make up his own facts," as Plaintiff alleges (Dkt. 12 at 3), or ignore Plaintiff's testimony.  Instead, he found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record generated during the period at issue," including because:

> the record shows a lack of follow-up on and prior to the date last insured and significant gaps in treatment sought and received on and prior to the date last insured. She had relatively minimal treatment for each impairment and there does not appear to be any persistent use of pain medications or even conservative treatment, including physical therapy. Her activities of daily living were perhaps limited but not beyond what one might consider to reflect

---

[7]     Plaintiff testified that she last worked in December 2011, at which time she took early retirement.  (R. 122.)

a light residual functional capacity. She did all the cooking[8] and she was able to travel without any significant problems.

(R. 30-31.)

Plaintiff takes issue with other statements in the ALJ's decision, arguing:

As noted above, the ALJ said that claimant had no tremors noted in a 2013 neurological exam, yet in that exact same cited exhibit, page 12 of Exhibit 15F, under "Assessment/Plan," the second noted assessment, is "Essential tremor." The ALJ also said that this was a neurological exam, when under Assessment/Plan it is clearly and boldly noted as a "Health Maintenance Examination". (T1971)

(Dkt. 12 at 4.)

This argument does not demonstrate any flaw in the ALJ's opinion. The cited page of Exhibit 15F does in fact state "Neurologic Exam: Normal gait and speech, no tremor." (R. 1971.) The fact that the cited page also notes Plaintiff's diagnosis of essential tremor under "ASSESSMENT/ PLAN," along with recommending that Plaintiff undergo a mammogram, coloscopy/screening, a metabolic panel, and bloodwork, does not call into question the ALJ's reliance on Dr. Radovich's observation that Plaintiff was not exhibiting a tremor on that date. (*See* R. 1971.)

Finally, Plaintiff challenges the ALJ's reliance on a physical therapist's medical record from November 2017 because "a physical therapist is not an acceptable medical source according to the Social Security Administration." (Dkt. 12 at 4-5 (citing 20 C.F.R. § 404.1502).) The ALJ relied on the physical therapist's notes in two ways: first, that the claimant was noted to have tremors when examined in November 2017, and

---

[8]     The Court notes that Plaintiff's husband, not Plaintiff, did the cooking. (R. 167-168.) However, Plaintiff testified that she could cook if she chose to. (R. 168.)

14

second, because "[h]ere, again, there is no indications [sic] of any work-related limitations due to this condition on and prior to the date last insured."  (R. 31-32.)  To the extent the ALJ relied on the physical therapist for purposes of a medical opinion as to Plaintiff's limitations (or lack thereof), Plaintiff is correct that a physical therapist is not an acceptable medical source.  *See* 20 C.F.R. § 404.1502(a) (listing acceptable medical sources); *see also Michel v. Colvin*, 640 F. App'x 585, 594 (8th Cir. 2016) ("A physical therapist is not an acceptable medical source.") (quotations omitted).  However, "examination notes and some initial conclusions related to Plaintiff's various impairments, without offering any other opinions regarding any specific work-related limitations," do not constitute a medical opinion.  *Asha S. v. Kijakazi*, No. CV 21-1014 (BRT), 2022 WL 4226230, at *10 (D. Minn. Sept. 13, 2022).  Moreover, the tremor was only "occasionally seen with slow movement of lower and upper extremities" during that November 2017 visit, Plaintiff "[a]ppear[ed] to be in good physical condition," and Plaintiff did not report any concerns relating to the tremor and her ability to handwrite, eat, or perform any other tasks or activities at that time.  (R. 2473.)  Neurological exams conducted on April 16 and 17, 2018 (when Plaintiff was hospitalized for malignant hypercalcemia and suspected multiple myeloma) did not mention Plaintiff's tremor and noted "[n]o acute neuro defects."  (R. 2415-2417.)  She "remain[ed] on her beta-blocker [propranolol] and medications" and the plan was for her to continue taking those medications.  (R. 2416-2417.)  Accordingly, even if the Court disregards the absence of limitations imposed by the physical therapist as a medical opinion from an unacceptable medical source, the Court concludes that substantial evidence still supports the ALJ's

15

evaluation of the severity of Plaintiff's tremors.  *See Nash*, 907 F.3d at 1089 ("If

substantial evidence supports the Commissioner's conclusions, this court does not reverse

even if it would reach a different conclusion, or merely because substantial evidence also

supports the contrary outcome"); *see also Walters v. Colvin*, 615 F. App'x 394, 395 (8th

Cir. 2015) (claimant has burden to prove severity and RFC) (citing *Kirby v. Astrue*, 500

F.3d 705, 707-08 (8th Cir. 2007) (burden as to severity), and *Martise v. Astrue*, 641 F.3d

909, 923 (8th Cir. 2011) (burden as to RFC)).

**B.     RFC Finding**

The Court turns to Plaintiff's second argument that the ALJ's RFC finding is not

based on substantial evidence.  (Dkt. 12 at 2, 5-7.)  Plaintiff asserts: "Missing from the

ALJ's RFC or hypotheticals to the VE was any mention of [Plaintiff's] hand tremors and

how they affected her."  (*Id.* at 6.)  This is incorrect.  The ALJ's RFC incorporated a

limitation of "frequently handle, finger and feel with bilateral hands."  (R. 29.)

"'Frequent' means occurring from one-third to two-thirds of the time."  Social Security

Regulation ("SSR") 83-10, 1983 WL 31251 (S.S.A 1983); *see also Maryan H. S. v. Saul*,

No. CV 19-23 (BRT), 2020 WL 1470970, at *3 (D. Minn. Mar. 26, 2020)

("'Occasionally' means 'occurring from very little up to one-third of the time' (up to 2.67

hours out of an 8-hour work day).  'Frequently' means 'occurring from one-third to two-

thirds of the time' (2.67 to 5.33 hours out of an 8-hour work day).") (citing SSR 83-10).

Plaintiff recognizes that "frequently" means performing an activity or condition from

one-third to two-thirds of the time, but argues that "[g]iven the fact that [Plaintiff]

testified that prior to her date last insured she was having difficulty keeping food on her

fork, and trouble writing, etc. it seems implausible that she could use both hands up to two thirds of the day." (Dkt. 12 at 7.)  Consequently, according to Plaintiff, the VE's testimony does not constitute substantial evidence on which the ALJ could base his disability determination because both the RFC and the hypotheticals presented to the VE incorporated this "frequently" limitation.  (*Id.* at 7, 12-13.)

Defendant responds that the ALJ's determination of the RFC, including the limitation of "frequently handle, finger and feel with bilateral hands," is supported by substantial evidence.  (Dkt. 14 at 5, 9-10.)  Defendant argues that because the RFC is supported by substantial evidence, the hypotheticals that the ALJ proposed to the VE were proper and the VE's testimony that Plaintiff could perform her past relevant work as a Project Director both as she performed it and as it is generally performed in the national economy constitutes substantial evidence in support of the ALJ's conclusion that Plaintiff is not disabled.  (*Id.* at 9-10.)

The Court has addressed the evidence in the record in Section IV.A supporting the ALJ's assessment of the severity of Plaintiff's hand tremors.  This includes the evidence that Plaintiff's tremors were improved and well-controlled by medication.  (R. 415, 418, 1969.)  "If an impairment can be controlled by treatment or medication, it cannot be considered disabling."  *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) (cleaned up); *see also Maune v. Berryhill*, No. 4:17 CV 1479 ACL, 2018 WL 4333550, at *5 (E.D. Mo. Sept. 11, 2018) (finding plaintiff's improvement in his essential tremor while "on medication is significant, because an impairment that is amenable to treatment cannot be disabling") (citing *Bernard v. Colvin*, 774 F.3d 482, 488 (8th Cir. 2014)).  Further, the

medical record contains observations of no, occasional, or mild tremor in January 2013, October 2014, and November 2017 (R. 1971, 1982, 2473), and Plaintiff testified that she was able to tie her shoes; brush her teeth; brush her hair; use buttons, zippers, and standard food utensils (although she reported some difficulty during the August 12, 2020 hearing); and cook if she chose to (R. 128-129, 167-168). Plaintiff "traveled a lot" for her job (R. 121); was able to drive, although her back pain was an issue (R. 124-125); traveled for pleasure (R. 159); babysat her grandchildren (R. 167); was able to dress and bathe herself without assistance (R. 167); and could wash dishes, wash clothes, and go grocery shopping (R. 168). This constitutes substantial evidence for the ALJ's conclusion that Plaintiff could frequently handle, finger, and feel with bilateral hands. *See, e.g.*, *Colette C. C. v. Kijakazi*, No. 20-CV-2282 (NEB/TNL), 2022 WL 4084187, at *12-14 (D. Minn. July 28, 2022) (affirming ALJ's limitation of frequent handling and fingering where tremor at issue improved with occupational therapy, Plaintiff engaged in a wide variety of activities requiring the use of her hands, including walking a dog, doing puzzles, driving, going to the grocery store, and making meals, and manipulative limitations included by the ALJ were consistent with the opinions of the state agency medical consultants), *R. & R. adopted*, 2022 WL 4080727 (D. Minn. Sept. 6, 2022); *Maune*, 2018 WL 4333550, at *5 (affirming ALJ's determination that tremor demonstrated in handwriting which improved to a mild tremor with medication was non-severe; also affirming ALJ's determination that restricted plaintiff to frequent (rather than

occasional) handling, fingering, and feeling with his bilateral upper extremities based on the tremor).  The ALJ properly considered that evidence when formulating the RFC.[9]

## C.     The ALJ's Decision to Hold the Hearing

Plaintiff asserts that the ALJ committed reversible error by holding the hearing when it was "clear from the record that [Plaintiff] did not understand the 'date last insured issue' and should have been encouraged to obtain legal counsel for her complex case." (Dkt. 12 at 2-3, 7-9.)  In particular, she argues that only 115 pages of the exhibits before the hearing were from before the June 30, 2017 date last insured, she only hired counsel after losing at the hearing level, and her counsel obtained approximately 66 pages of new medical evidence, including records from September 2009 showing her difficulty with handwriting.  (*Id.* at 7-8.)  Plaintiff also argues that it was clear from the outset of the hearing that she was confused about the procedure, specifically that the hearing dealt with the period before June 30, 2017 (the date last insured).  (*Id.* at 8.)  Plaintiff argues that the ALJ failed in his duty to fully and fairly develop the record, requiring remand.[10] (*Id.* at 8-9.)

---

[9]     Defendant also argues that even if the "frequently" limitation was in error, such error was harmless because "[a]s generally performed, the project director job requires only occasional fingering and handling, and feeling is 'not present.'"  (Dkt. 14 at 10 (citing *Dictionary of Occupational Titles*, 189.117-030, 1991 WL 671489 (project director).)  This argument assumes that the correct RFC would incorporate "occasional" limitations (rather than frequently) for fingering and handling.  Notably, Plaintiff did not argue that she could not engage in occasional fingering and handling or perform the Project Director job as generally performed in the national economy.

[10]    Plaintiff also argues that the alleged failure to fully and fairly develop the record tainted the step three conclusions (Dkt. 12 at 11), but has not identified any Listing that she believes she met based on the record as of the time of the second hearing or the

Defendant responds that Plaintiff knowingly and intelligently waived her right to counsel, that there is no evidence that she did not understand her burden to prove disability on or before the date last insured, and that the ALJ complied with his duty to fully and fairly develop the record.  (Dkt. 14 at 12-14.)  Defendant also contends the additional records obtained by counsel were consistent with the ALJ's determination that Plaintiff could return to her past relevant work and that, even if the new evidence is considered, substantial evidence supports the ALJ's conclusions.  (*Id.* at 14-16.)

The Court agrees that Plaintiff knowingly and voluntarily waived her right to counsel.  She received written notices of her right to counsel.  (R. 215-222, 229, 233-234, 250-251.)  And at the August 12, 2020 hearing, the ALJ engaged in the following colloquy regarding her unrepresented status:

> ALJ: . . . And ma'am, you are appearing on the phone today without an attorney or a non-attorney representative. Do you have any questions as to your rights to representation?
>
> CLMT: I do not.
>
> ALJ: And is it your intention today to proceed with the hearing without a representative?
>
> CLMT: It is just myself and my husband today.
>
> ALJ: All right, but the question is, is it your intention today to proceed with the hearing without a representative?
>
> CLMT: Correct.

(R. 115.)

---

additional records obtained by counsel after the ALJ denied her claim or provide any further detail.  *See ASARCO, LLC v. Union Pac. R. R. Co.*, 762 F.3d 744, 753 (8th Cir. 2014) ("Judges are not like pigs, hunting for truffles buried in briefs or the record." (internal quotation marks omitted).  The Court therefore rejects any step three argument.

At the second hearing on November 17, 2020, the ALJ reminded Plaintiff that she had waived her right to representation at the previous hearing, and asked if she "continue[d] to do so today?"  (R. 152.)  Plaintiff responded "Yes, I do."  (R. 152.) As another court in this District has explained:

> In determining whether a claimant understood the rules and regulations pertaining to her right to counsel, the Eighth Circuit considers any written notices from the SSA explaining the claimant's right to counsel and the claimant's replies. *Wingert v. Bowen*, 894 F.2d 296, 298 (8th Cir. 1990). The District of Minnesota examines the same, additionally considering whether the claimant is aware at the hearing of her right to an attorney. *See Stroud v. Barnhart*, No. 04-cv-35, 2005 WL 679074, at *2 (D. Minn. Mar. 22, 2005) (concluding the claimant was adequately informed of and knowingly waived her right to counsel because she received at least three notices about her right to counsel, and at the hearing before the ALJ, acknowledged that she received the notices and wanted to proceed pro se ); *Filipi* [*v. Shalala*, No. 3-93-785, 1994 WL 706692, at *3 (D. Minn. Sept. 30, 1994)] (concluding the claimant knowingly and intelligently waived her right to counsel because she received two notices about her right to counsel, and at the hearing before the ALJ, acknowledged that she was aware of her right to an attorney and wanted to proceed pro se ).

*Hungerford v. Colvin*, Civ. No. 14-0613 (DSD/HB), 2014 WL 7272669, at *12 (D. Minn. Dec. 18, 2014).

Here, Plaintiff does not argue that she was not advised of her right to counsel or that she did not understand her right to counsel.  Rather, she argues that "[t]he ALJ was remiss in not insisting that [Plaintiff] obtain counsel for her hearing, because he missed very important records which supported [her] claim."  (Dkt. 12 at 8.)  Plaintiff cites no authority for the proposition that an ALJ can "insist" that a claimant retain counsel, nor is the fact that "very important records" were missed the legal standard for determining whether a claimant knowingly and intelligently waived their right to counsel.  The Court

finds no error in the ALJ's decision to proceed with both hearings knowing Plaintiff was unrepresented.

The Court also is unpersuaded that Plaintiff and her husband did not understand that the relevant time period was on or before June 30, 2017.  The ALJ instructed Plaintiff:

> ALJ: . . . . As a result, you need to show to me that you were disabled on or prior to June 30th of 2017. Okay?
>
> CLMT: Okay.
>
> ALJ: It does not matter whether you're disabled or not today. You need to show to me that you were disabled on or before that date. Okay?
>
> CLMT: Yes.
>
> ALJ: All right. So as we go through the file, when I ask you questions about any medical conditions you might have experienced on or before June 30th of 2017, that's the reason why that's important.
>
> CLMT: Correct.

(R. 117-118; *see also* R. 153-154 (Plaintiff responding "Yes" and "I do" to the ALJ's question at the November 17, 2020 hearing "And if you remember, the period at issue in your case is on or before June 30th of 2017.  You remember that?").)

Moreover, the ALJ anchored his questions to Plaintiff to the period of on or before June 30, 2017 by including that time frame in his questions.  (*See, e.g.*, R. 120-130, 155, 157, 159, 165, 167-168, 170.)  Similarly, he made clear to Plaintiff's husband that:

> Q Okay. Now, the key to your wife's claim is whether or not she was disabled on or before June 30th of 2017, okay?
>
> A Yes.

Q That's her burden, to show that she was disabled on or before that date.

A Okay.

(R. 132; *see also* R. 140 ("ALJ: And it's your burden, not mine, to submit evidence that establishes disability on or before June of '17.  WTN: Correct.").)

The ALJ also anchored his questioning of Plaintiff's husband to the time period of on or before June 30, 2017.  (*See, e.g.*, R. 132, 134, 147, 171, 175.)

In sum, there is no evidence in the transcript that either Plaintiff or her husband did not understand the relevant time period, much less that they were so confused that the ALJ should not have proceeded with either hearing.

Finally, the Court addresses the question of whether the ALJ fully and fairly developed the record.

> When a claimant is unrepresented, the ALJ has a heightened duty to "fully and fairly develop the record so that a just determination of disability may be made." *Filipi*, 1994 WL 706692, at *5 (citing *Clark v. Shalala*, 28 F.3d 828, 830 (8th Cir. 1994)). The ALJ, however, is "not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." *Clark*, 28 F.3d at 830-31. . . . Usually, courts defer to the ALJ's judgment regarding how much evidence is necessary to develop the record fully. *Filipi*, 1994 WL 706692, at *4. A "significant omission is usually required before this court will find that the Secretary failed to assist *pro se* claimants in developing the record fully and fairly." *Id.*

*Hungerford*, 2014 WL 7272669, at *13.

Here, Plaintiff identifies approximately 66 pages of medical evidence (R. 39-111) obtained by counsel after the hearings as evidence that supported Plaintiff's claim and undermined the ALJ's contention that Plaintiff had "significant gaps in treatment on and prior to the date last insured."  (Dkt. 12 at 7-9 (citing R. 29).)

To show the record has been inadequately developed, Plaintiff must show both a failure to develop necessary evidence and unfairness or prejudice from that failure. *Haley v. Massanari*, 258 F.3d 742, 749-750 (8th Cir. 2001) (holding "reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial" and holding an ALJ may issue a decision without obtaining additional evidence if existing evidence provides sufficient basis for the decision) (cleaned up).

Beginning with the alleged failure to develop necessary evidence, when Plaintiff's husband raised the issue of missing medical records at the August 12, 2020 hearing, the ALJ gave Plaintiff 10 days to submit records in her possession as of the date of that hearing and 30 days to obtain any other missing records "from Grand Itasca Clinic or any other medical source, other than a chiropractor." (R. 136-141; *see also* R. 145-148.) Plaintiff's husband responded: "I think Grand's probably the only thing that's missing." (R. 140.) The ALJ also indicated that if Plaintiff needed more time, he would grant it. (R. 140-141; *see also* R. 147.)

At the November 17, 2020 hearing, the ALJ specifically asked about any outstanding records, and Plaintiff told him there were none. (R. 153.) Plaintiff has not identified any specific doctor or medical facility that the ALJ should have contacted but did not, nor has Plaintiff explained how the ALJ was to know there were additional missing records. Moreover, as Defendant points out, about 35 pages of the records at issue were already in the record at Exhibit 15F. (Dkt. 14 at 15; *Compare* R. 39-74, *with* R. 1960-2003.) The Court finds that the ALJ fulfilled his obligation to "develop a

24

reasonably complete record," *see Clark*, 28 F.3d at 830, including by giving Plaintiff time to obtain additional medical records and holding a second hearing.

Although the Court finds the ALJ fulfilled his obligation with respect to the record, the Court also considers the question of fairness and prejudice. The Court sets forth below the entries in the new records relating to Plaintiff's tremors.

Medical records from July and August 2009 document Plaintiff's previous visit with Dr. Nelson in 2006 and her belief that her tremors were getting worse.[11] (R. 81-85.) On July 29, 2009, she reported difficulty with keyboarding and writing at work, had been on primidone for years but was not sure of the benefit, and had not tried any other medications for the tremor. (R. 81.) She had recently been discharged from a detox unit, was on family medical leave, and had started drinking again due to frustration with her tremor. (R. 81.) At that visit, she had "significant tremors of her hands with intentional movement." (R. 81.) Plaintiff's primidone prescription was increased, she was prescribed propranolol, and it was recommended that Plaintiff see Dr. Nelson again. (R. 81.) It appears that Plaintiff saw Gregg Waylander, F.N.P., during the July 29, 2009 visit. (*See* R. 82 ("She followed up with Gregg Waylander on 7/29, i.e., 1 week ago, and was treated with Valium. . . . Today she is experiencing a lot of tremors and is quite shaky.").)

---

[11]     The Court notes that several months earlier, as of October 1, 2008, Plaintiff's tremor "seem[ed] to be well controlled with primidone" and the plan was to "try to wean down a bit on dosage." (R. 418.)

On August 6, 2009, Plaintiff saw Grace Khouri, M.D.  (R. 82.)  She presented with a "flare-up and worsening of her essential tremor."  (R. 82.)  Her "symptoms [were] complicated by the fact that she is a chronic alcoholic and ha[d] abused alcohol," which Plaintiff used to treat her symptoms.  (R. 82.)  She had been released from a 72-hour rehab on July 26, 2009.  (R. 82.)  She was "experiencing a lot of tremors and [wa]s quite shaky."  (R. 82.)  Her exam was consistent with a diagnosis of essential tremors and she had both intentional and passive tremor.  (R. 82.)  She had a follow-up scheduled with Dr. Nelson and left in "good and stable condition."  (R. 82.)

As of August 11, 2009, Plaintiff followed up with F.N.P. Waylander on her tremors, hormone replacement therapy, and "additional problems."  (R. 83.)  She reported that the increased primidone dose had resulted in "very slight improvement" in her tremors, she had an appointment scheduled with Dr. Nelson, and she requested a referral to neurology at Rochester "somewhere down the line if she's not seeing improvement." (R. 83.)  Examination revealed slight improvement in her tremors, and if Plaintiff was speaking about non-stressful subjects, they got "significantly better for a brief period." (R. 83.)  F.N.P. Waylander intended to ask for a referral to the Mayo Clinic and recommended that Plaintiff start propranolol.  (R. 83.)

On September 14, 2009, Plaintiff reported to Carol Lietzau, M.D., that she had "a lot of difficulty with the tremor," had taken a month off work, and had an appointment scheduled with Dr. Nelson.  (R. 84.)  She had driven herself to chemical dependency

treatment and was going to Alcoholics Anonymous 4-6 times a week.[12]  (R. 84.)  The tremor was worst with writing, holding a cup, and magazines, so "really [wa]s worse w/ working."  (R. 84.)  She was taking primidone and propranolol.  (R. 84.)  Dr. Lietzau had no concerns about the requested Mayo Clinic referral.  (R. 84.)

The notes from Dr. Nelson's September 22, 2009 neurology consultation with Plaintiff states that she thought her tremor was getting worse, was noticing a tremor of her head, and was having issues with writing at work.  (R. 75.)  However, Plaintiff reported that her Mysoline prescription had recently been doubled and that was helping somewhat.  (R. 75.)  She was also taking propranolol as needed.  (R. 75.)  Plaintiff had been back at work for a week, was having issues with writing and keyboarding, including clutching a pencil so hard to keep it from shaking that she had increasing discomfort in her neck and shoulder and her arm would feel like spaghetti.  (R. 75.)  "She just want[ed] to make sure she [wa]s on the right medications."  (R. 75.)  On examination, "[n]o tremor [wa]s seen with rest but there [wa]s tremor with intention and with sustention."  (R. 77.)  "Minimal tremor [wa]s seen in the head" while seated.  (R. 76.)  Plaintiff felt the Mysoline was helpful, and Dr. Nelson recommended continuing it at 250 mg twice daily, and taking propranolol on a regular basis rather than as needed, increasing to one 40-mg tablet for a week, then one and a half 40-mg tablets for a week, and then to two 40-mg tablets.  (R. 77.)  Dr. Nelson advised Plaintiff that "this is slowly progressive and

---

[12]    It is not clear whether the tremor, the chemical dependency treatment, or both were the reason why she took a month off work, but the Commissioner appears to concede it was due to the tremor and the treatment.  (Dkt. 14 at 15.)

medication is going very well." (R. 77.) Plaintiff was given information about a deep brain stimulator, and Plaintiff "realized that she [did have] an appointment to be seen at the Mayo Clinic at some later date." (R. 77.) Dr. Nelson advised that the purpose of that appointment was to see if she would be interested in deep brain stimulation. (R. 77.) A handwriting sample from that appointment shows some difficulty in handwriting. (R. 80.)

A note written by F.N.P. Waylander on January 29, 2010, indicates that he "also discussed [with Plaintiff] the possibility of her tremor becoming a significant disabling condition, possibly leading to a disability evaluation if she continues to have difficulty with her work." (R. 85.) This record appears to be missing its first page, as it does not contain Plaintiff's name, the date of service, and it reads as a continuation of other notes. (R. 85.)

At an annual exam with Vicky Moe, M.D., on November 19, 2010, Plaintiff reported a history and complaints of tremor, but the examination did not document any tremors during the visit. (R. 88-93.) The plan was to refill her tremor medications and check her labs for any side effects. (R. 92.)

On April 30, 2011, F.N.P. Waylander observed that Plaintiff did "have some tremors though she stated that's related to a familial tremor problem which is stable.". (R. 107-109.) He did not recommend any follow-up as to the tremor. (R. 107-109.)

The records do indicate that for a few months in 2009, Plaintiff was experiencing issues with her tremors and reporting that it was affecting her work. However, the records also indicate that her tremor improved with increases in her medication and after

she saw Dr. Nelson.  (R. 75, 77, 88-93, 107-109.)  There is no indication that Plaintiff ever pursued her referral to the Mayo Clinic or any treatment other than medication, nor did Plaintiff pursue a disability evaluation in 2010 or 2011.  Rather, Plaintiff decided to take an incentive package to retire at the end of 2011.  (R. 369.)  Having considered all of the new evidence relating to Plaintiff's tremors in conjunction with the remainder of the record, the Court concludes that substantial evidence still supports the ALJ's RFC in view of the relatively short duration of Plaintiff's work-related issues in 2009; the fact that (except for a one month leave of absence), she worked notwithstanding her tremors; the fact that medication improved Plaintiff's tremors and she did not seek treatment beyond the medication; the instances where she exhibited no or mild tremors; and her activities of daily living.  Plaintiff therefore has not met the unfairness or prejudice prong with respect to the ALJ's duty to develop the record.

* * *

For the reasons stated above, the Court denies Plaintiff's Motion for Summary Judgment, grants Defendant's Motion for Summary Judgment, and dismisses this action with prejudice.  Further, in view of this Order, the announcement scheduled for March 1, 2023 is cancelled.

## V.    ORDER

Based on the above, and on the files, records, and proceedings herein, **IT IS ORDERED** that**:**

1.    Plaintiff Motion for Summary Judgment (Dkt. 11) IS **DENIED**;

29

2.      Defendant Acting Commissioner of Social Security Kilolo Kijakazi's

Motion for Summary Judgment (Dkt. 13) is **GRANTED**.

3.      The announcement scheduled for March 1, 2023 (Dkt. 16) is

**CANCELLED**.

4.      This case is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

DATED: February 13, 2023                    *s/Elizabeth Cowan Wright*
                                            ELIZABETH COWAN WRIGHT
                                            United States Magistrate Judge